41 So.3d 833 (2008)
Huey Lee BRANNON
v.
STATE of Alabama.
CR-06-1571.
Court of Criminal Appeals of Alabama.
December 19, 2008.
Rehearing Denied October 2, 2009.
*834 Jeffery G. Rainer, Tuscaloosa, for appellant.
Troy King, atty. gen., and John J. Davis, asst. atty. gen., for appellee.
SHAW, Judge.
AFFIRMED BY UNPUBLISHED MEMORANDUM.
McMILLAN and WISE, JJ., concur. WELCH, J., dissents, with opinion, which BASCHAB, P.J., joins.
WELCH, Judge, dissenting.
I believe that this case involves a failure to repay a debt, and as such, it is a civil matter and not the proper subject of a criminal prosecution. Therefore, I must respectfully dissent from the unpublished memorandum affirming Huey Lee Brannon's conviction for theft pursuant to § 13A-8-2(a), Ala.Code 1975.
The indictment charging Brannon with theft alleged that he knowingly obtained or exerted unauthorized control of approximately $46,321.74. The indictment charged that the money was the property of Bombardier Capital, Inc. ("BCI"); American Manufactured Homes, Inc. ("AMH"); and/or Kelley and Linda Laminack. Brannon moved for a judgment of acquittal on the ground that the State failed to prove that a crime had been committed. After reviewing the record and the applicable law, I agree with Brannon that there is not sufficient evidence to support a theft conviction. Specifically, there is no evidence to support a finding that Brannon either took property that legally belonged to another or that he exerted unauthorized control over any money or checks belonging to another.
The evidence in this case tended to show the following. In 1999, the Laminacks, doing business as AMH, entered into a contract with Brannon, who was doing business as Wholesale Outlet. Pursuant to the terms of the contract, Brannon was to pay the Laminacks $4,200 a month in return for his operation of AMH. Among Brannon's duties as enumerated in the contract was the responsibility for making the payments for all business expenses. In return for the $4,200 paid to them each month, the Laminacks agreed to allow Brannon to use AMH's equipment and to have access to its financing sources, which were better than Brannon's, to purchase inventory for the mobile-home business.
Among AMH's financing sources was BCI, which had an "Inventory Security Agreement" with AMH, pursuant to which BCI would provide funding that would allow AMH to acquire "inventory," i.e., mobile homes. BCI held a security interest in the inventory. AMH would repay the money it borrowed from BCI as the inventory was sold.
Brannon began operating AMH as agreed and used his own company's name, Wholesale Outlet, as the business name. The evidence is undisputed that from March 1999, when the contract between AMH and Brannon was executed, until October 2001, when the United States economy took a downturn as a result of the terrorist attacks of September 11, 2001, Brannon sold scores of mobile homes. During that time, he was meeting all of the business expenses and making the $4,200 payment to the Laminacks each month. When the economy declined after September 11, however, Brannon did not sell as many mobile homes as he had been selling, and he failed to make his monthly payments to the Laminacks.
In May 2002, Brannon sold a mobile home to Ray Snow. Snow purchased the mobile home with a personal check for $38,000, made payable to Wholesale Outlet. Brannon endorsed the check, went to Snow's bank, and cashed the check, asking *835 that the proceeds be paid to him in the form of an "official check," formerly known as a cashier's check. Brannon then deposited the official check into a new business account that he had opened in the months just before Snow purchased the mobile home.
BCI was owed $27,219 for the loan it had made to AMH for the purchase of the particular mobile home Snow purchased. BCI also was owed an additional $19,102.74 in unpaid interest that had accrued for all of the mobile homes AMH had financed through BCI. BCI mailed a letter to AMH demanding payment pursuant to the Inventory Security Agreement. Brannon gave the letter to the Laminacks and acknowledged that AMH/Wholesale Outlet did not have the money available to pay BCI. The State presented evidence indicating that earlier, Brannon had assured Kelley Laminack that BCI had been paid in full for the loan it had made to enable AMH to purchase the mobile home that Snow bought. The Laminacks, whose credit was at risk and who had agreed to personally guarantee the loans BCI made to AMH, paid BCI the amount owed. They then liquidated the inventory and ended the business. Brannon said that when the inventory was liquidated, he was not able to sell any more mobile homes to pay the amount owed to BCI.
Linda Laminack, an employee of the Tuscaloosa County District Attorney's Office, asked the district attorney to investigate the situation. The district attorney or one of his deputies told Tony McGhee of the Northport Police Department about the case and asked him to investigate. McGhee had Brannon's bank records subpoenaed. He reviewed the checks that Brannon wrote from his business accounts after the $38,000 was deposited and found that those checks were written to pay usual business expenses.
As mentioned, Brannon was charged with theft for obtaining or having the "unauthorized control" of the money Snow paid for the mobile home he bought from AMH/Wholesale Outlet. The indictment alleges that the money belonged to BCI, AMH, or the Laminacks.
I do not believe that Brannon wrongfully obtained or had unauthorized control over the money Snow paid for the mobile home. Under the contract he had with AMH, as well as the practice between the parties for several years, Brannon accepted the payments from those who purchased mobile homes from AMH/Wholesale Outlet. Furthermore, because he was required to pay the expenses of the AMH, Brannon had control over the money paid to AMH/Wholesale Outlet and made decisions regarding how that money was to be disbursed.
In similar cases, Alabama appellate courts have determined that conduct such as Brannon's constitutes the basis for a civil action, not a criminal prosecution. For example, in Ex parte Thomas, 828 So.2d 952 (Ala.2001), the Alabama Supreme Court issued a writ of mandamus directing this court to withdraw its own writ directing the circuit court to vacate its order dismissing the indictment against Thomas.
The facts in Thomas are similar to those in the present case. The Supreme Court set out the prosecution's theory of the case as follows:
"The theory of the prosecution is that Maddox's [a general contractor] cost-plus contract for the construction of a house required him to devote the draws he received from the owner to payment for the materials used in the construction of the house; that he did not pay some of the material suppliers; that he allowed some of his payments to suppliers to be credited to his debts from *836 other jobs instead of his debts for this job; and that he had thereby `obtain[ed] or exert[ed] unauthorized control over [the] checks or lawful currency' constituting the draws paid him by the owner, who eventually paid some of the material suppliers herself and sued Maddox in a civil action."
Thomas, 828 So.2d at 953.
The Supreme Court held that Maddox's prosecution was an illegal attempt to collect a civil debt, and explained its rationale as follows:
"The theory of prosecution is based on a false premise. The false premise is that the contract between Maddox and the owner required Maddox to devote his draws to payment for the materials used on this job. The only pertinent provisions of the contract are:
"`1. The contractor agrees to furnish and pay for all labor and materials necessary to construct those certain improvements on the premises located at 143 Myrtlewood....
"`2. The contractor agrees to do the foregoing work in a good and workmanlike manner and to deliver same to the owners free from any claims or liens....
"`....
"`11. The owners shall make payments [(the draws)] to the contractor, following each calendar month after the date of commencement of construction, according to itemized list of invoices for materials, labor, subcontractors statements plus overhead and profit, no later than the 10th of each month.
"`12. The contractor shall submit evidence satisfactory to the owner that all payrolls, materials bills, and other indebt[ed]ness connected with the work have be[e]n paid in full.'
"While the provisions of paragraphs 1, 2, and 12 make the contractor ultimately responsible for paying for the materials, no provision of the contract restricts the contractor in his use of the particular draws paid to him by the owner pursuant to paragraph 11. The draws became due to Maddox, not the suppliers, according to the progress in the construction. But for a few exceptions, the materials had been incorporated into the house when the owner paid Maddox the draws occasioned by those materials. The owner, who intentionally paid the draws to Maddox, knew what materials had, and what materials had not, been incorporated as she paid the draws. The owner fired Maddox from the job before the construction was complete. These facts, proved by the evidence introduced or proffered by the State itself, affirmatively disproved the allegation in the indictment that Maddox `obtain[ed] or exert[ed] unauthorized control over [the] checks or lawful currency' constituting the draws. Judge Thomas [the circuit court] was justified in concluding that this prosecution during the very pendency of the owner's civil action based on Maddox's same nonpayment of suppliers was so unwarranted that the indictment should be dismissed."
Thomas, 828 So.2d at 955.
In Smith v. State, 665 So.2d 1002 (Ala. Crim.App.1995), this Court reversed Smith's conviction for theft of property and rendered judgment in his favor, finding that the prosecution failed to present evidence from which a jury could reasonably find that Smith intentionally deprived the victim, Betty Holmes, of money she had given him to purchase 72 screen-printed T-shirts.
This court summarized the evidence presented at trial and set forth the reason for its holding as follows:

*837 "Holmes contacted [Smith] after a friend recommended him and praised his work. Holmes's own satisfaction with [Smith's] past work for her was a factor in hiring him to screenprint her T-shirts. Holmes paid [Smith] $250 in advance and told [Smith] that she wanted the T-shirts ready in time for `the election,' which was several months away, but she was vague about when [Smith] was to have the T-shirts completed. Holmes acknowledged that [Smith] telephoned her and told her that he was unable to find the yellow T-shirts she had requested. However, she was never successful in several attempts to reach him by telephone. [Smith] designed the artwork for Holmes's T-shirts, which he says was of no value to him unless he intended to use it to produce her T-shirts. The search for the yellow T-shirts took several weeks. During this time, [Smith's] already poor financial condition worsened and he was ultimately unable to produce the T-shirts. [Smith] sought protection from creditors by filing for bankruptcy. The delay in beginning Holmes's project allowed [Smith] to spend Holmes's money on other things, e.g., the hospitalization of his mother-in-law and her subsequent funeral expenses. The fact that the $250 given to him by Holmes was dissipated did not prove that he did not intend to perform his promise when he accepted the money. Furthermore, evidence that [Smith] had previously been convicted of writing a check on a closed account did not prove that [Smith] had a history of corrupt dealings with customers. Writing a bad check is not a crime of the same nature as, and is not indicative of[,] a common plan or scheme to commit a theft of property against a customer as the present case charges.
"In Baker v. State, 588 So.2d 945, 947 (Ala.Crim.App.1991), Baker's conduct nearly mirrored that of [Smith] in this case. This court affirmed Baker's conviction, finding that sufficient evidence of intent was presented. In both Baker and this case the appellants accepted money in return for providing a service for the victim; failed to provide the service; failed to return the money; did not respond to telephone requests for satisfaction by the victims; performed some work toward the ultimate goal; and alleged financial difficulties as an excuse for their conduct. However, in Baker this court put great emphasis on the fact that Baker had a history of defrauding his customers in this way. This court found Baker's history indicative of a common plan or scheme to defraud customers. As previously stated, [Smith] did not have a history of defrauding customers.
"`The test to be applied in reviewing the sufficiency of circumstantial evidence is not whether the evidence excludes every reasonable hypothesis except that of guilt, but whether a jury might reasonably so conclude. Dolvin v. State, 391 So.2d 133, 137-38 (Ala. 1980); Cumbo v. State, 368 So.2d 871, 874 (Ala.Crim.App.1978), cert. denied, 368 So.2d 877 (Ala.1979).' McCord [v. State], 501 So.2d [520,] 529 [(Ala.Crim.App.1986)]. The evidence in this case was not such that the jury could reasonably conclude that [Smith] intended to commit a theft of property. Essentially the State's evidence in this case was as follows: 1) [Smith] failed to produce the T-shirts as promised; 2) [Smith] failed to telephone the victim more than one time to inform her of problems in acquiring the yellow T-shirts; and, 3) [Smith] failed to return the victim's money. These facts, taken in a light most favorable to the prosecution, prove only that [Smith] failed to *838 perform a contractual obligation he had with the victim, and as such, his actions constitute, if anything, a breach of contract, which merits a civil remedy. An affirmance under the facts presented in this case would only serve to cast prosecutors in the role of judgment collectors and encourage potential civil litigants to seek a remedy in a criminal court in the form of restitution. The end result would be to hinder the expeditious disposition of the enormous criminal docket already in existence."
Smith, 665 So.2d at 1003-1004.
Furthermore, in Rhyne v. H & B Motors, 505 So.2d 307 (Ala.1987), the Alabama Supreme Court explicitly held that a secured party is not the owner of the property in which it holds a security interest.
"`A secured party, as defined in section 7-9-105(m) [the Uniform Commercial Code], is not an owner in relation to a defendant who is a debtor, as defined in section 7-9-105(d), in respect of property in which the secured party has a security interest, as defined in section 7-1-201(37).' (Emphasis added [in Rhyne].)
"The undisputed testimony makes it clear that a valid security agreement existed between Rhyne and H & B Motors. Under this agreement, H & B Motors is a `secured party' as defined in § 7-9-105(1)(m), Code of 1975, and Rhyne is a debtor as defined in § 7-9-105(1)(d), Code of 1975. As a result, H & B Motors is not the `owner' of the automobile, of which the defendants charged Rhyne with theft. See § 13A-8-2, Code of 1975. Thus, as a matter of law, probable cause to charge Rhyne with the crime of theft of property did not exist."
Rhyne, 505 So.2d at 311.
In this case, there can be no doubt that Brannon properly accepted payment for the mobile home Snow purchased from AMH/Wholesale Outlet. The evidence is undisputed that he used the money to pay ordinary business expenses. The contract between Brannon and AMH is silent as to the source of the money Brannon was to use to pay those expenses; it also did not specify that Brannon was to pay the debt owed to AMH's creditorsincluding BCIwith the proceeds from the sale of a specific mobile home.
As was the case in Smith, Brannon was having financial difficulties and used the proceeds from the sale of the mobile home Snow bought to pay business expenses that were owed. He testified that his intention was to use the proceeds from future sales of AMH/Wholesale Outlet's inventory to pay the loan from BCI as to Snow's mobile home. And as Rhyne makes clear, because BCI was a secured party and, thus, not the owner of the mobile home Snow bought, the payment from Snow did not legally "belong" to BCI. Money owed is a debt; it cannot be said that any money in the possession of the debtor "belongs" to the creditor.
Both the State and this court's unpublished memorandum imply that Brannon's acceptance of Snow's check for the mobile home and then depositing the funds into Wholesale Outlet's new business account were somehow nefarious actions. But there is simply no evidence indicating that Brannon wrongfully obtained money or that he exerted unauthorized control over the money received from Snow as payment for a mobile home purchased from the business Brannon was operating. There is no legal basis for concluding that those proceeds "belonged" to either BCI or the Laminacks and that Brannon wrongfully took it from them.
The evidence tends to show that, if anything, Brannon's failure to timely repay a debt to BCI, an expense of AMH/Wholesale Outlet, constituted at most a breach of the contract he had entered into with *839 AMH, for which the remedy lies in a civil action. In today's constricting economic climate, many small business owners and operators are faced with making decisions regarding whom to pay when. A decision to pay one creditor over another at any given time does not mean that the business owner "stole" money from the creditor who is not timely paid.
As this court presciently pointed out in Smith, "[a]n affirmance under the facts presented in this case would only serve to cast prosecutors in the role of judgment collectors and encourage potential civil litigants to seek a remedy in criminal court in the form of restitution." Smith, 665 So.2d at 1004. There is no basis for a criminal prosecution here.
That is not to say that no wrongful conduct occurred in this case. Indeed, under the facts of this case as presented by the prosecution, i.e., Brannon's false statements to Kelley Laminack that Brannon had paid BCI in full for the money AMH had borrowed to purchase the mobile home that Snow bought, Brannon may be culpable for breach of contract, fraud or misrepresentation. However, those civil wrongs demand civil remedies. Convicting Brannon of theft for conduct that is carried out by businesses daily is a miscarriage of justice.
Because I believe that Brannon was entitled to a judgment in his favor as a matter of law, I must find that the trial court erred in denying the motion for judgment of acquittal. Therefore, I respectfully dissent.
BASCHAB, P.J., concurs.